

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-22-2005

# Bishop v. New Jersey

Precedential or Non-Precedential: Non-Precedential

Docket No. 04-3615

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Bishop v. New Jersey" (2005). *2005 Decisions.* Paper 788.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/788

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 04-3615

_____


DARIUS D. BISHOP; ERIC BARNES; CHARLES D. BISHOP; WILLIE J.
BOOKER; JOHN F. BROWN; SAMUEL EVANS; ALVIN C. FLEMING; TODD
HAYES; WILLIAM E. JAMES; CURTIS JOHNSON

*Appellants*

v.

STATE OF NEW JERSEY; THE NEW JERSEY DEPARTMENT OF PERSONNEL
AND MERIT SYSTEM BOARD; NEWARK FIRE DEPARTMENT; CITY OF NEWARK


_____


On Appeal From the United States District Court
For the District of New Jersey
(D.C. No. 02-cv-02219)
District Judge: Honorable John W. Bissell

_____


Submitted Under Third Circuit LAR 34.1(a)
June 30, 2005
Before: RENDELL, BARRY and BECKER, *Circuit Judges*



(Filed:  July 22, 2005)



_____


OPINION

_____

BECKER, *Circuit Judge.*

The plaintiffs, African-American firefighters employed by the Newark Fire Department, allege that a set of state actors, including the State of New Jersey, the City of Newark, and the Newark Fire Department violated their civil rights by denying them promotion on the basis of an eligibility exam which had a discriminatory and disparate impact on minority employees. Plaintiffs have pled claims under Title VII, the Uniform Guidelines for Employee Selection Procedures, 28 C.F.R. § 50.14, the 1980 Consent Decree between the City of Newark and the U.S. Department of Justice, 42 U.S.C. § 1981 and the New Jersey Law Against Discrimination. The District Court dismissed the case, Fed. R. Civ. P. 12(b)(6), because it found that it was the State's responsibility to create, administer, and promulgate the test results and that the municipal defendants' use of the test results in making promotion decisions was merely a neutral effect of the State's allegedly discriminatory act. Plaintiffs timely appealed, and we affirm.

## I.

Plaintiffs allege that the promotional exam given in 2000 "differed substantially from prior fire captain examinations" in that the new exam: 1) included 75 multiple choice questions in addition to the traditional essay format; 2) did not allow an applicant to take the oral portion of the exam unless he or she passed the written portion; and 3) provided that the written and oral portions of the exam were no longer given on a purely pass/fail basis but were given a numerical score. Of the 287 applicants who sat for the

written and oral exam in 2000, 129 passed. Only 29.5% of African-American candidates and 33.3% of Hispanic candidates passed the exam compared with 55.8% of White candidates. Plaintiffs also allege that other statistical analyses demonstrate a disparate impact on minority applicants.

The most important change, however, was a new way of factoring seniority into the exam results. Prior to 2000, each candidate with more than 15 years of seniority received a 20 point increase in his or her numerical exam score regardless of whether the candidate passed the written and oral portion of the exam. The 2000 exam, by contrast, introduced a "Z formula" in which those who failed the oral and written exam were automatically rejected, and those who passed would receive only one point for each year of service up to 15 years. An additional 10 points could be added if the candidate had a clean "Record of Service," meaning no suspensions. Plaintiffs claim that this formula had a disparate impact on minority applicants, many of whom were reaching the point where they had more than fifteen years seniority for the first time.

Plaintiffs filed suit in May, 2002. The history of this case, however, reaches back to a 1980 Consent Decree entered into between the U.S. Department of Justice and many New Jersey state and municipal entities, including the State of New Jersey and the City of Newark. Under the Consent Decree, defendants agreed to "refrain from engaging in any act or practice which has the purpose or effect of unlawfully discriminating against any Black or Hispanic [firefighting personnel] . . . in hiring, . . . promotion or discharge

because of race, color, or national origin." The participating municipalities, including Newark, also agreed to increase the number of qualified Black and Hispanic applicants for ranking positions and conform their conduct to the Uniform Guidelines for Employee Selection Procedures, 28 C.F.R. § 50.14. The plaintiffs, however, were not party to the 1980 Consent Decree.

There have been extensive prior proceedings in this case, with which the parties are familiar. For the most part, they are irrelevant to this appeal and hence the outcomes need not be repeated here. What is relevant is that the District Court, in the opinion giving rise to the present appeal, found that plaintiffs "make no allegation that the City Defendants were involved in the configuration and application of" the Z formula, the format, administration, scoring, or promulgation of the exam, and that it cited the following language in our opinion in *Bishop v. State of New Jersey* ("*Bishop II*"), 84 Fed. Appx. 220 (3d Cir. 2004):

> [t]he discriminatory act that plaintiffs allege is the design and administration of the exam and the concomitant promulgation of the eligibility list. The neutral use of the list by municipal fire departments is merely the effect of the alleged discriminatory exam.

*Id.* at 224. Therefore, the District Court concluded that "the City Defendants had no illegal involvement with the 2000 Exam. Instead, the City Defendants' use of the examination results was neutral. Plaintiffs, as well, do not adequately allege that the City Defendants were improperly involved."

II.

4

The procedure for establishing a Title VII disparate impact case is well known and we set it forth in the margin.[1] What is dispositive here is the District Court's reliance on our previous opinion in *Bishop II* to find that the City is not liable for using the results of the challenged test. Although that opinion was styled "not precedential," it here provides the law of the case.

In *Bishop II*, plaintiffs appealed the District Court's dismissal of their claims against the state actors. The District Court had held that the EEOC complaint was untimely. Plaintiffs argued on appeal that the District Court had erred in finding the EEOC complaint untimely because the promotion decisions and ongoing validity of the eligibility list resulting from the challenged promotional exam constituted a continuing violation of Title VII. Plaintiffs claimed that a discriminatory act occurred each time they were passed over for promotion by the municipalities because of their ineligibility under the state test results. We disagreed. Instead, we found that "[t]he discriminatory

---

[1] "[P]laintiffs establish a prima facie case of disparate impact by demonstrating that application of a facially neutral standard has resulted in a significantly discriminatory hiring pattern." *Lanning v. Southeastern Pennsylvania Transp. Authority (SEPTA)*, 181 F.3d 478, 485 (3d Cir. 1999); *see Dothard v. Rawlinson*, 433 U.S. 321, 329 (1977). Once the plaintiffs have established a prima facie case, the burden shifts to the employer to show that the employment practice is "job related for the position in question and consistent with business necessity . . . ." 42 U.S.C. § 2000e-2(k)(1)(A)(i). We held in *Lanning* that "in order to show the business necessity of a discriminatory cutoff score an employer must demonstrate that its cutoff measures the *minimum* qualifications necessary for successful performance of the job in question." 181 F.3d at 489 (emphasis added). If the employer meets this burden, the plaintiffs may nevertheless prevail if they can demonstrate that an alternative employment practice has a less disparate impact and would also serve the employer's legitimate business interest. *Id.* at 489-90.

act that plaintiffs allege is the design and administration of the exam and the concomitant promulgation of the eligibility list. The neutral use of the list by municipal fire departments is *merely the effect* of the alleged discriminatory exam." *Id*. at 224 (emphasis added). We further noted that plaintiffs' Complaint does *not* allege that "the manner in which individuals were promoted from the list when vacancies arose was discriminatory . . . . Only in their Reply Brief do plaintiffs suggest—albeit without explanation---that the promotions themselves were discriminatory. This suggestion is both belated and bereft of support." *Id.* at 225 n.9. Thus, *Bishop II*'s holding necessitates a finding that the City's use of the exam results is not an act of discrimination.

This result is supported by two cases cited in *Bishop II*, *Bronze Shields, Inc. v. New Jersey Dep't of Civil Serv.*, 667 F.2d 1074 (3d Cir. 1981), and *Delaware State College v. Ricks*, 449 U.S. 250 (1980), both of which suggest that otherwise neutral use of an allegedly tainted exam is not itself a discriminatory act under Title VII, but rather is merely an effect of the prior act of discrimination. *See also Cox v. City of Memphis*, 230 F.3d 199 (6th Cir. 2000) (the use of an allegedly tainted list was not a discriminatory act where "the promotions were made neutrally, *i.e.*, in rank order, from the eligibility list and any discrimination occurred in the compilation of the list"); *but see Guardians Ass'n of New York City Police Dept. v. Civil Service Comm'n of City of New York,* 633 F.2d 232 (2d Cir. 1980) (taking the (minority) view that the city's "reliance on eligibility lists reflecting performance on discriminatory examinations constituted a program of

discriminatory hiring which terminated only when the last person was hired off the lists").

*Bronze Shields* has obvious analogies to this case. In *Bronze Shield*s, the plaintiffs were required to take a written exam administered by the New Jersey Department of Civil Service in order to become Newark police officers. If an applicant passed the exam, then he or she would be placed on an eligibility roster ranked by score on the exam. Newark would use this ranked list to screen and ultimately hire new officers. The plaintiffs had each failed the exam or the screening process and sued the State and City for violation of Title VII, claiming that the exam was discriminatory and had disparate impact.

Like *Bishop II*, the ultimate question in *Bronze Shields* was *when* the discriminatory act accrued, not *who* is liable for the act. Nevertheless, to determine when the violation occurred, it was necessary for the court in *Bronze Shields* to "identify precisely the []employment practice of which plaintiffs complain and separate it from the inevitable, but neutral consequences of the allegedly discriminatory practice." 667 F.3d at 1083. In so doing, *Bronze Shields* rejected the contention that Newark "continued to discriminate against [plaintiffs] by its use of the eligibility roster" because "plaintiffs do not allege that Newark would have followed anything but a neutral, non-discriminatory procedure in hiring from the list. Newark's policy was simply to hire from the list." *Id.*

In short, *Bishop II* and *Bronze Shields* ultimately had to determine when the

violation occurred for statute of limitation purposes. Nevertheless, in order to make that determination, it was necessary for the court in both cases to decide whether the municipalities' use of an allegedly tainted eligibility roster was itself a discriminatory act. In both cases, we unequivocally held that the use of such a list is merely the neutral effect of a prior act of discrimination, but does not constitute a separate, discriminatory action. This was precisely the reasoning the District Court applied in dismissing the claims against the municipal defendants.

This result is bolstered by the fact that under New Jersey's civil service law, municipalities are required to use the results of the state-run eligibility tests in hiring and promoting employees. *See* N.J.S.A. § 11A:4-5 ("Once the examination process has been initiated due to the . . . request for a list to fill a vacancy, the affected appointing authority *shall be required* to make appointments from the list if there is a complete certification.") (emphasis added). In New Jersey,

> [a] career civil service job, such as a paid firefighter . . . is subject to competitive examination procedures . . . . The minimum qualifications of candidates must be announced beforehand. The scope of requirements that applicants must meet are established by the Department of Personnel and specified in the examination announcement. After the examination, the Department of Personnel may certify the names of eligibles for each position. Upon receipt of certification, an appointing authority may, under the "rule of three" appoint "one of the top three interested eligibles" from the list.

*In re Hruska*, 867 A.2d 479, 483-84 (N.J. Super. Ct. App. Div. 2005) (citations omitted); *see generally* N.J. Admin. Code tit. 4A, §§ 2.1-2.17 (competitive examination

procedure); §§ 3.1-3.10 (eligibility lists); §§ 4.1-4.10 (certification of the eligibility lists).

This "rule of three" permits some discretion in hiring decisions, but has the "basic intent and effect . . . to fetter the absolute discretion of government to hire." *Id.* at 484 (quoting *Terry v. Mercer County Bd. of Chosen Freeholders*, 430 A.2d 194 (N.J. 1981)). The fact that Newark had no choice but to use the eligibility list, and limited discretion in choosing who to hire from the list, would weigh heavily in support of the conclusion that the City's use of the list was a neutral, ministerial action, rather than a separate discriminatory act.

The order of the District Court will be affirmed.[2]

---

[2]Judge Rendell does not view the ruling as to the City's dismissal to be controlled by the Court's previous decision in *Bishop II*, because the issue being urged here on appeal pertains to the City's duty---separate and apart from the State's testing---to independently "investigate and validate any selection procedure prior to using that procedure to make employment decisions." (Appellants' brief, p. 11). However, Judge Rendell would affirm because the complaint does not sufficiently plead a claim based on this theory of liability against the City.